IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JERRY D. PATTEN and <br> JERRY & SONS REPAIR-TOWING, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> GREG DODSON, HERB WILLIAMS, HOWARD JONES, ROBERT SMITH, ANDRE MARSHALL, and DAVID SAUER, Individually and in their official capacities <br><br> Defendants. | Case No. 21-cv-1335-SMY |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiffs Jerry D. Patten and Jerry & Sons Repair-Towing, Inc. filed the instant lawsuit against Defendants Greg Dodson, Herb Williams, Howard Jones, Robert Smith, Andre Marshall, and David Sauer, individually and in their official capacities, asserting violations of their First Amendment rights. Defendants move for summary judgment (Doc. 35), which Plaintiffs oppose (Doc. 36).

### Factual Background

Construed in the light most favorable to Plaintiffs, the evidence and reasonable inferences establish the following facts relevant to the pending summary judgment motion: Pursuant to Section 5/4-203.5 of the Illinois Vehicle Code[1] (625 ILCS 5/1-100, *et seq*.) and § 13-60 the Centralia Code of Ordinances (Doc. 35-1, Ex. A; Doc. 35-1, Ex. B, p. 29), the Centralia Police Department

---

[1] Pursuant to Illinois Vehicle Code, each law enforcement agency whose duties include the patrol of highways shall maintain a tow rotation list to be utilized by law enforcement officers authorizing the tow of a vehicle within the jurisdiction of the law enforcement agency.

("CPD") maintains a tow rotation list consisting of several tow truck operators. The operators work with the CPD to tow motor vehicles after arrests, traffic accidents, and in conjunction with other CPD-related activities (Doc. 35-1, Ex. A; Doc. 35-1, Ex. B, pp. 20-23). Centralia's chief of police has the sole discretion to remove operators from the CPD tow rotation list (Doc. 35-1, Ex. A; Doc. 35-1, Ex. E, pp. 23-24). A tow truck operator can become disqualified for "actions that are not in the best interest of the city or police department" (Doc. 35-1, Ex. A).

On July 19, 2020, the Marion County Housing Authority ("MCHA") requested assistance from the CPD to conduct "a compliance check" on vehicles parked at MCHA properties in Centralia (Doc. 35-1, Ex. B, p. 28). During a "compliance check," the CPD checks to ensure that vehicles parked on MCHA property display a valid parking sticker or visitor's pass (Doc. 35-1, p. 30; Doc. 31-1, Ex. B). If a vehicle does not have a sticker or pass, the CPD instructs the towing company to tow the vehicle on behalf of the MCHA. *Id.*

The CPD contacted Plaintiff Jerry Patten's tow company, Jerry & Sons Repair-Towing, Inc. ("JSRT") to facilitate the towing of vehicles at the MCHA property (Doc. 35-1, Ex. B, pp. 8-9, p. 30). Patten and two of his sons responded and towed 39 vehicles. *Id.* at pp. 32-33. They initially towed 12 vehicles to the company's regular impound lot in Central City. *Id.* After the lot was full, they towed the remaining 27 vehicles to Patten's home in Sandoval. *Id.* At the Sandoval property, Plaintiffs displayed a Confederate flag on a 20-foot flagpole. *Id.* at pp. 35-36.

Centralia officials began receiving complaints about Plaintiffs' Confederate flag almost immediately after vehicle owners began retrieving their vehicles from the Sandoval lot (Docs. 35-1, Ex. F, pp. 9-11; Doc. 35-1, Ex. G, pp. 21-23). Rick Garrett saw the Confederate flag when he drove his daughter to pick up her vehicle on July 20, 2020 (Doc. 35-1, Ex. H, pp.12-13). Garrett went to the CPD and voiced his concerns about the flag to CPD Chief Greg Dodson. *Id.*

Marion Garrett became aware of Plaintiffs' use of the Confederate flag after she was contacted by a group of MCHA tenants who had their vehicles towed by Plaintiffs (Doc. 35-1, Ex. I, pp. 11-12). After hearing the residents' complaints, Garrett voiced her concerns about the flag to Dodson and sent an email to Centralia City Manager Lowell Crow. *Id.; see also* Doc. 35-1, Ex. J, p. 17. The Garretts saw the flag as a symbol of racism and believed Plaintiffs' use of the flag reflected negatively on the CPD and the City (Doc. 35-1, Ex. H, pp. 12-13; Doc. 35-1, Ex. I, pp. 14-15).

Centralia officials received numerous other complaints about Plaintiffs' Confederate flag (Doc. 35-1, Ex. J, p. 9). Mayor Herb Williams received complaints from members of the Centralia community, including leaders of religious and civic organizations. *Id.* City Councilmen David Sauer, Howard Jones, Andre Marshall, and Robert Smith also received complaints, and Sauer and Jones reported observing negative posts on social media (Doc. 35-1, Ex. G, pp. 22-23; Doc. 35-1, Ex. J).

To address the public's concerns, Williams, Dodson, Sauer, and Crow met with Marion Garrett, Rick Garrett, and Eric Collins of the NAACP (Doc. 35-1, Ex. E, pp. 45-46). During the meeting, the city officials listened to the group's concerns and held a discussion about the issues created by the "compliance check." *Id.*

Dodson and Patten met in Dodson's office within a week after the MCHA tows (Doc. 35-1, Ex. E, pp. 32-36). During the conversation, Patten told Dodson that he was being called a racist on social media and that he was not a racist; he was a redneck. *Id.* Patten stated that the Confederate flag was a symbol of "redneck heritage" (Doc. 35-1, Ex. B, p. 37). Dodson told Patten that some residents saw the flag as a symbol of hate and that Plaintiffs' actions reflected negatively on the CPD (Doc. 35-1, Ex. E, pp. 32-36). Dodson explained that the CPD could not be perceived

as having a racial bias. *Id.* Patten acknowledged that many people view the Confederate Flag as a symbol of racism and that it has historically been used by groups such as the Ku Klux Klan (Doc. 35-1, Ex. B, pp. 42-43). Patten further acknowledged that Plaintiffs' actions while performing work for the City affected how people viewed the City and its elected officials and that Plaintiffs' actions could reflect poorly on the City. *Id.* Dodson believed that Patten would remove the flag following their meeting. *Id.*

After Patten's discussion with Dodson, Plaintiffs put up numerous additional Confederate flags at the Sandoval property (Doc. 35-1, Ex. E, pp. 29-31; Doc. 35-1, Ex. F, p. 12; Doc. 35-1, Ex. G, p. 16). City officials also became aware that Patten was selling Confederate flags on Facebook, was attaching Confederate flags to his motorcycle, and that people were creating and putting Confederate flag-JSRT stickers on their vehicles (Doc. 35-1, Ex. E, pp. 29-31; Doc. 35-1, Ex. B, pp. 52-53; Doc. 35-1, Ex. K).

The City Council addressed Plaintiffs' flying of the Confederate flag at open meetings on July 27, 2020, and August 10, 2020. Rick Garrett conveyed his concerns about the flag and asked what steps were being taken to alleviate racial tensions and to get Plaintiffs to remove the flag (Docs. 35-1, Exs. J, N, and O). Williams, the City Council, and Dodson discussed the public's complaints about the flag, the need to discuss the issue with Plaintiffs and the possibility of passing a resolution to address the problem (Doc. 35-1, Exs. J, L, X).

Dodson explained his decision to ultimately remove JSRT from the tow list as follows:

> The Confederate flag, in and of itself, is a symbol – whether or not this is how Patten is exhibiting it under these terms – of racial discord, racial hate, discrimination, oppression towards minority community…In Centralia, we live in a community that has a…very high percentage of minorities…And at the same time, when we're towing vehicles and taking enforcement action, they represent a higher number of arrests and vehicle towed than their 10 percent representation. And this, in and of itself, makes us in a position where we have to guard against anything that makes it look like the actions that are being taken are for any other reason outside legal justifiable law enforcement activity. They can't be viewed as

> biased. We can't be viewed as being prejuditory [sic] or discriminating against one member of the society or another. And this put the department in a very, very bad position that – here is a company we're doing business with who is towing a lot of minority vehicles, and now it's come to light that he's displaying this flag at a location where they had to go and retrieve their vehicles.

(Doc. 35-1, Ex. E, p. 28). Dodson also considered the potential for civil unrest, violence, and property damage in making his decision to remove Plaintiffs from the tow rotation list in the wake of George Floyd's death several months prior. *Id.* at pp. 48-49.

On August 18, 2020, Dodson sent Plaintiffs a letter removing JSRT from the CPD's tow rotation list pursuant to 625 ILCS 5/4-203.5(b) and § 13-60(i) of the Centralia Code of Ordinances (Doc. 35-2, Ex. Q). In the letter, he stated that Plaintiffs' use of the flag "imputes bias on the City and is not in the best interests of the City or its residents." *Id.* Dodson also issued a press release related to Plaintiffs' Confederate flag and JSRT's removal from the tow rotation list (Doc. 35-2, Ex. R). On October 25, 2021, Plaintiffs filed the instant lawsuit against Defendants Williams, Dodson, and Centralia City Council Members Judge David Sauer (ret.), Howard Jones, Robert Smith, and Andre Marshall alleging violations of their First Amendment rights (Doc. 1).

## Discussion

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party is entitled to summary judgment where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

Government employees have certain limitations on their freedom of speech, but they do not "relinquish the First Amendment rights [they] would otherwise enjoy as a citizen to comment on matters of public interest." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (internal punctuation omitted). In *Pickering*, the Supreme Court, aiming to strike a balance between employees' rights "and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees", set out the required elements for a government employee First Amendment claim under 42 U.S.C. § 1983, *Id*. A plaintiff must show that: (1) he was speaking as a private citizen; (2) on a matter of public concern; and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in "promoting effective and efficient public service." *Id.* This balancing test applies with equal force to independent government contractors such as Plaintiffs. *Bd. Of County Comm'rs, Wabaunsee County, Kan. V. Umbehr*, 518 U.S. 668, 677 (1996). Here, it is undisputed that Plaintiffs' act of displaying the Confederate flag constitutes private citizen speech.

Private citizen speech addresses a matter of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146 (1983); *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). Whether an employee's speech implicates a matter of public concern is a question of law that "must be determined by the content, form, and context of a given statement as revealed by the whole record." *Connick,* 461 U.S. at 138, 147–48.

Patten testified that he displayed the Confederate flag as a symbol of his "redneck heritage." Members of the community viewed the flag as a symbol of hate, racism, and bigotry.

The Confederate flag communicates an array of messages and courts have recognized that displaying the flag as a symbol of heritage is a divisive statement of public concern. *See Cotriss v. City of Roswell, Georgia*, 2019 WL 13021858, at *5 (N.D. Ga. July 3, 2019), *aff'd sub nom. Cotriss v. City of Roswell,* No. 19-12747, 2022 WL 2345729 (11th Cir. June 29, 2022) (collecting cases). This Court joins them. While Patten's stated motivation may appear private in nature, the existing social and political context render Plaintiffs' display of the Confederate flag a statement of public concern. That said, such speech is not afforded First Amendment protection unless Plaintiffs' interest in making the speech outweighs Defendants' interest in operating an effective and efficient public service.

The potential disruption of the public service need not actually occur for the employer to act to protect its interests; courts must give substantial weight to government employers' reasonable predictions of disruption. *See Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1118 (7th Cir. 2013). The employer's assessment of possible interference must be reasonable, supported by an evidentiary foundation, and more than mere speculation. *Id*. The nature of the employee's job must also be considered by the court as an employer has more leeway in restricting the speech of an employee whose position requires contact with the public. *Id.*

"The effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias." *Lalowski v. City of Des Plaines*, 789 F.3d 784, 792 (7th Cir. 2015) (quoting *Locurto v. Guiliani*, 447 F.3d 159, 178 (2nd Cir. 2006). Undoubtedly, effective operation of a police department requires maintaining positive relations with the community it serves. Members of the public had their vehicles towed by Plaintiffs at the direction of the CPD and were

forced to retrieve them from a location where the Confederate flag was prominently displayed. This presented an obvious association between the flag and CPD.

Almost immediately after Plaintiffs towed the vehicles, the CPD and other city officials began receiving complaints from the vehicle owners, members of the community and leaders of religious and civic organizations about the display of the flag. Chief Dodson testified that he was worried that a continued relationship with Plaintiffs would lead to civil unrest particularly since the towing occurred two months following the death of George Floyd. Significantly, Patten acknowledges that Plaintiffs' actions affected how people viewed the City and its elected officials and that their actions could reflect poorly on the City. Nevertheless, after his discussion with Chief Dodson, Plaintiffs placed additional Confederate flags on their property.

A genuine potential for speech to harm a police department's reputation justifies an employer acting before that harm is realized. *See Connick*, 461 U.S. at 151-52. Here, the potential was more than conjecture, and Chief Dodson did not need to wait for further disruption to occur before he acted. The City and CPD's desire to provide effective police services – not perceived as racist or biased – outweighs Plaintiffs' interests in symbolizing their "redneck heritage."[2]

---

[2] Defendants also move for summary judgment on qualified immunity grounds. Had the Court concluded that Plaintiffs suffered a constitutional violation, Defendants would be entitled to qualified immunity. A constitutional right is clearly established "only if its contours are 'sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). While the fact patterns of prior cases used to show that a right is clearly established need not be "fundamentally similar" or even "materially similar," the salient question is whether the law at the time of the alleged violation gave officials "fair warning" that their acts were unconstitutional. *Hope v. Pelzer,* 536 U.S. 730, 740 (2002). Considering police departments' heightened interests in providing efficient public service, the outcome does not so evidently favor Plaintiffs such that Defendants were expected to know that removing Plaintiffs from the tow rotation list in this instance would result in a constitutional violation. Thus, the Court concludes that Plaintiffs' First Amendment rights in this context were not clearly established.

### Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED in its entirety.** The Clerk of Court is **DIRECTED** to enter judgment accordingly and to close this case.

**IT IS SO ORDERED.**

DATED:  September 26, 2023

*[signature]*

**STACI M. YANDLE**
**United States District Judge**